NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOEL JESSE VASQUEZ, | ) | No. C 12-3157 LHK (PR) |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION FOR |
| | ) | WRIT OF HABEAS CORPUS; |
| vs. | ) | DENYING CERTIFICATE OF |
| | ) | APPEALABILITY |
| G.D. LEWIS, | ) | |
| | ) | |
| Respondent. | ) | |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition should not be granted. Respondent has filed an answer, and petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled to relief based on the claims presented, and DENIES the petition.

**PROCEDURAL HISTORY**

In 2008, a jury found petitioner guilty of two counts of forcible oral copulation, threatening to commit a crime resulting in great bodily injury, domestic violence with a prior, and assault with a deadly weapon. The jury also found true several enhancement allegations. Petitioner was sentenced to a term of 25 years to life plus 14 years in state prison.

On February 2, 2011, the California Court of Appeal affirmed petitioner's convictions

and judgment. (Pet., Ex. 1 at 9-43.) On May 11, 2011, the California Supreme Court denied petitioner's petition for review. (*Id.*, Ex. 1 at 94.)

On June 19, 2012, petitioner filed the underlying federal petition for writ of habeas corpus.

## BACKGROUND[1]

**Prosecution Case**

Tanya M. met defendant on August 26, 2005. They started living together shortly thereafter and were in a relationship until October 30, 2005. They stayed in defendant's room at his parents' home in San Jose or in a room in a converted garage at defendant's friend's (Friend) house in San Jose. They moved back and forth between the two residences because defendant argued with his family.

In September, defendant started carrying a sawed-off shotgun. [FN2] He kept the shotgun in a duffle bag and carried it with him everywhere.

> FN2. The probation report indicates that defendant was on probation for prior offenses and subject to a no-weapons condition at that time. That information was not presented to the jury.

The physical violence started a week after Tanya started dating defendant. The first time, defendant punched Tanya on the right side of her head, between her eye and her ear, because he was upset that she had had a conversation with a former classmate. A week later, defendant got upset after he talked to Tanya's ex-boyfriend and punched her in the head again. She did not sustain any bruises, swelling, or other injuries in the first two incidents.

After the second incident, the beatings "started coming daily." Tanya testified that defendant punched her, kicked her, hit her with bricks wrapped in a towel, threw a chair at her, stabbed her, and broke wooden boards over her arms and legs. She was afraid of defendant because he was hurting her "very badly" and was out of control. Defendant often pulled her hair, which caused a throbbing pain; he pulled her hair out and sometimes, she felt "something watery" running down her scalp. She did not know if it was blood; her head was too swollen for her to touch. She did not tell defendant it hurt, because if she showed pain, he hurt her more. While she was with defendant, she had so many black eyes, she could not recall being without one. Three other witnesses recalled seeing Tanya with a black eye.

Defendant was under the influence of alcohol or methamphetamine every day that they were together. Tanya used drugs with defendant. At first, she used methamphetamine occasionally. But as time went on, she used the drug almost every day because "it numbed the pain" of being beaten. She got the methamphetamine from defendant.

Tanya has a daughter (Daughter) who was 13 or 14 years old when Tanya

---

[1] The following facts are taken from the California Court of Appeal's opinion.

lived with defendant. Daughter's father (P.A.) is mixed-race (Black and White). Tanya's last boyfriend was Black. This upset defendant and he addressed her using racial epithets every day.

**Assault With a Deadly Weapon, a Screwdriver (Count 6)**

At the end of September or early October, defendant stabbed Tanya in the left knee with a screwdriver while she was sitting on a couch in his parents' garage. He stabbed her because he had asked her to take one of his friends somewhere in her car and she took too long. In response, she just sat there because defendant would get mad at her if she "showed pain" and she did not want to get hurt anymore. She did not go to the hospital because the staff would have asked her how she got injured, which would have gotten defendant in trouble and caused Tanya further problems. Tanya has a scar on her knee.

**Defendant Threatens Tanya, Her Family, and Others**

Starting at the end of September, defendant repeatedly threatened to kill Tanya, her daughter, and her (Tanya's) family. He made threats when he was mad and it did not take much to "set him off." He said it more than once and Tanya believed he could do it. Defendant also threatened P.A. over the phone. Tanya was scared for her family and angry at herself for putting them in harm's way.

When Tanya started dating defendant, Tanya had custody of Daughter 66 percent of the time. Daughter lived with Tanya's mother and father. Tanya had been involved in a custody battle with P.A. and his wife (V.A.) [FN3] for a number of years. While Tanya was with defendant, P.A. filed for full custody, alleging that Tanya was involved with a gang member who had threatened P.A. Tanya did not defend the allegation and lost custody of Daughter to P.A. on October 7, 2005. Tanya did not fight for custody of Daughter at that time because she was concerned for Daughter's safety and knew that she (Tanya) "wasn't in a good place" for Daughter.

> FN3. To protect their identities, we refer to Tanya's daughter as "Daughter" and to Daughter's father and step-mother by their initials.

**Beating in Early to Mid-October – Assault With a Deadly Weapon (Count 4)**

In early to mid-October 2005, defendant inflicted "the worst beating [Tanya] ever had from him." Tanya does not recall what made him mad that day. Defendant struck Tanya in the left forehead with the shotgun. At trial in 2008, she still had an indentation and a bump on her forehead from that blow. Defendant hit her with the shotgun and his fists; he kicked her, stomped on her head with his feet, and slammed her head into the floor of their room at Friend's house. He stopped when Friend came in.

When asked why she did not leave defendant, Tanya said, "Leaving isn't always as easy as just getting up and going." She was afraid defendant would hurt her more and hurt her family. He had met her mother and knew where her parents lived.

**Threats to Commit a Crime (Count 2)**

In mid-October, in their room at Friend's house, defendant put his shotgun by Tanya's mouth, on her mouth, and in her mouth and said he should kill her because she is probably one of the demons that talk to him in his sleep. He removed the gun and started rambling about something else. Tanya was afraid and thought he would shoot her.

**Defendant Threatens His Father With the Shotgun**

On October 12, 2005, defendant got into a fist fight with his father, Joe Vasquez, at his parents' home. Later that day, defendant and Tanya went to defendant's aunt's house. Defendant's father and sister were there. When defendant's father and sister left, defendant told Tanya they should also leave. On the way home, defendant instructed Tanya to pull her car up alongside his father's car, which Tanya did. She looked over and saw defendant pointing the shotgun at his father. Joe Vasquez put his car in reverse. As he drove away, defendant shot the shotgun into the air.

San Jose Police Officer Todd Trayer testified that Joe Vasquez called the police, reported that defendant had brandished a sawed-off shotgun at him, and said he wanted to press charges. Officer Trayer interviewed Joe Vasquez and defendant's sister, both of whom said defendant brandished a shotgun at them.

At trial, Joe Vasquez denied telling the police officer that defendant pointed a shotgun at him. He testified that he did not know what defendant pointed at him, but was scared by "whatever" defendant pointed at him because defendant had been drinking. Defendant's sister did not recall this incident and denied telling the police that defendant pointed a shotgun at her.

**Forcible Oral Copulation (Count 3)**

When they first started dating, Tanya had sexual intercourse with defendant voluntarily almost every day. After he started beating her, they argued almost every day about Tanya's lack of interest in performing oral sex. If she refused, defendant called her "worthless," "useless," "dumb," and "fat bitch." She did not want to say "no" to him because he would get mad at her and hurt her, so she tried to avoid performing oral sex.

On one occasion in mid-October, Tanya's jaw was painful from being punched by defendant. Her jaw was swollen and it hurt to open her mouth, to yawn, and to eat. At that time, "there wasn't a part of [her] head that wasn't swollen." When defendant asked her to orally copulate his penis that day, she told defendant she did not want to do it because her jaw was sore and it hurt to perform oral sex. Defendant had punched her in the face an hour earlier. He said she was exaggerating, insulted her, and told her she was worthless. She made it clear to him that she did not want to do it, but gave in because he would not leave her alone. She was afraid that he would hurt her again if she did not comply.

**Evidence Relating to Defendant's Tattoos**

Tanya testified that she was afraid of defendant, in part, because of his tattoos and the gang affiliation suggested by the tattoos. She stated that there were

aspects of defendant's life that she was afraid to talk about. When asked whether they involved gangs, she said that she did not want to answer; that she was afraid of being hurt by defendant's family and friends and by defendant if he is released. She believed talking about gangs could lead her or her family members to be hurt and she was nervous about answering gang-related questions.

Nonetheless, Tanya testified about defendant's tattoos. Photographs of his tattoos were also in evidence. Defendant's upper chest and arms are tattooed with the images of 10 women. Some of the images are just faces; others depict females from the waist up with bare breasts; one depicts a completely nude female. One of the females is wearing a sombrero with the word "Norte" on it. Defendant also has the word "Norte" tattooed on his upper right hand and in large letters across his back. The Roman numeral "XIV" (14) is tattooed in large letters on his back, on three fingers of his left hand, and on the entire space on the front of his neck. Defendant has the Roman numeral "X" tattooed on his right hand and four dots on his left hand, also signifying the number 14. He has four dots tattooed under his left eye. Tanya testified that she was concerned about the "affiliation" signified by these tattoos and defendant's ability to find her and hurt her if she ever left him.

**Events of October 30, 2005 (Domestic Violence (Count 5) and Forcible Oral Copulation with Enhancements (Count 1)**

On October 30, 2005, defendant and Tanya were staying at his parents' house. Between midnight and 1:00 a.m., defendant called Tanya and asked her to pick him up at a friend's house. When she arrived, defendant was with a man she had never seen before. Defendant told Tanya to drive them to Hollister. Defendant was angry during the drive to Hollister. He hit her once because he did not like the route she took. Defendant had been drinking and drank a beer in the car.

After they dropped defendant's friend off, defendant hit Tanya and said, "[Y]ou thought I forgot about earlier?" Tanya believed he was angry because she talked to his friend when they stopped to buy gas. Defendant hit her two more times. As she was getting onto the freeway, he hit her again. He hit her so hard in the right eye, that all she could see was "white." She said, "[P]lease let me just get home safe. Let me just get home safe." Defendant calmed down, then hit her again. He said he could not be with her because her daughter was Black. Defendant hit Tanya in the stomach, right breast, and back of the head with the barrel of his shotgun. She said, "Let me just get us home safe." On the way home, he hit her more than 20 times with his fists and the gun. He punched her in the lip and blood was "gushing" out of her nose.

When they got home, she hid so his family would not see her. When everyone was back in bed, she went inside and washed the blood off her face. There was blood on her shirt, her bra, and her pants. Dried blood was smeared all over her face. Her lip was swollen and she had cuts on her lip. She went into the kitchen. Defendant said his family was angry with him for hurting her. He pushed her up against the refrigerator, choked her with one hand, covered her mouth with his other hand, and said, "I'm looking at life and you ain't shit, bitch." He released her and they went upstairs to his room. On the stairs, he hit her in the back of her head with the butt of the shotgun.

In the bedroom, Tanya sat on the bed and took off her shirt and pants. Defendant said, "[Y]ou want to see a savage? You're going to see a savage now." Defendant put the shotgun under the mattress, where he usually kept it. Defendant put his hand over her mouth, squeezed hard, and "smother[ed] her mouth." She said, "I can't take any more. You are killing my soul." Defendant grabbed her by the hair and pulled her head down to his penis. She knew what he wanted. She did not want to orally copulate him; she did not want him touching her at all. She was afraid and crying and said, "[P]lease, I can't take no more, please." She started to orally copulate him. He punched the right side of her head while she had his penis in her mouth. When she pulled away, he said, "do it" and punched her again. He punched her twice each time; this sequence happened four times. Finally, he stopped punching her so she could complete the sex act.

Defendant passed out on the bed. Tanya waited 10 minutes and fled.

**Medical Care, Police Investigation, and Injuries**

Tanya drove to her parents' house and asked her mother (Mother) to take her to the hospital. Mother wanted to take her to the police, but Tanya begged Mother to take her to the hospital. Mother wanted to take her to Valley Medical Center, but Tanya told her to go to a hospital outside of San Jose because she was afraid defendant would find her and hurt her again.

Mother took Tanya to Saint Louise Hospital in Gilroy. On the way to the hospital, Tanya told Mother that she had been beaten, but did not mention any sex offenses because she was embarrassed and thought it was "disrespectful" to talk to her mother about her sex life.

The emergency room physician and the nurse who treated Tanya testified at trial. Tanya gave a history of being assaulted, of being hit with fists and metal objects while driving. She did not report a sexual assault. Tanya's injuries included multiple contusions to her scalp and face, extensive bruising around her eyes, older bruising on her left eyelid, and bruises to her right side and right breast. Both of her eyelids were swollen shut and she was diffusely tender to touch on her neck and scalp. Tanya's vision was blurred and she complained of ear pain and headaches. Tanya had severe soft tissue swelling but no intracranial injury or fractures.

The hospital is a mandated reporter and the nurse called the police. Two Gilroy Police officers responded and spoke with Tanya and Mother. Tanya told Mother not to give the police defendant's name because "snitches get killed." Tanya did not want to talk to the police and refused to disclose defendant's name at the hospital because she did not want to "face the repercussions" of reporting him. Mother told the police that the perpetrator was a Norteño, that he had threatened to kill Daughter, and that Tanya would not disclose his name because she was protecting her parents and Daughter. Tanya reported being beaten while driving, but did not report a sex crime. The officers photographed Tanya's injuries. A domestic violence crisis worker came to the hospital and took Tanya to a shelter.

Detective Rosa Quinones of the Gilroy Police did the follow-up investigation. Detective Quinones took a recorded statement from Tanya on November 2, 2005. At that time, the police suspected that defendant was her abuser, but Tanya refused to disclose his identity, saying that she was "too scared" and

that "she wasn't ready" to disclose.

Detective Quinines spoke with Tanya by phone on November 10, 2005. At that time, Tanya still refused to disclose her abuser's identity. Tanya complained that she was having bad headaches and that her eyesight was "messed up."

Tanya met with Detective Quinones on November 11, 2005, and disclosed that defendant was her abuser. She knew defendant had been taken into custody on another matter on November 7, 2005, which made it easier for her to talk to the police. The detective took another statement, which was not recorded, and additional photos of Tanya's injuries. On November 11, 2005, Tanya reported both incidents of sexual abuse. Detective Quinones took another recorded statement from Tanya on January 12, 2006. At that time, Tanya described both incidents of forcible oral copulation.

Tanya's bruises lasted a week and a half. She had migraine headaches, head pain, and blurred vision that lasted six months to a year. She had memory problems for six months. She has a scar on her lip, a scar over her right eyebrow, and a lump and an indentation on her left forehead.

**Evidence of Prior Domestic Violence (Count 5)**

Veronica L. dated defendant for six months in 2002. She was inside his parent's house on September 16, 2002. Defendant was drinking and arguing with his father outside. Defendant yelled for Veronica to come outside, but she did not comply. Defendant kicked down the front door, grabbed Veronica by the hair, and punched her in the face two or three times. Defendant's father and brother pulled defendant off of her; defendant's mother took her to the hospital. Her injuries included swelling and bruising to her face and nose. As a result of this incident, defendant was convicted of misdemeanor battery. According to the probation report, which was not before the jury, defendant was placed on probation and ordered to complete a domestic violence program.

**Defense Case**

Defendant did not testify. Defendant did not dispute the domestic violence, assault and criminal threats charges, but argued that the forcible sex offenses did not happen. He relied on Tanya's delayed reporting of the alleged forcible oral copulation, disputed her descriptions of those incidents, and attacked her credibility.

P.A. and V.A. testified that more than eight years before trial, during their custody dispute, Tanya falsely accused V.A. of abusing Daughter by spanking her and hitting her. V.A. testified that the allegations were not true; that she had to hire an attorney to defend herself, and that the allegations were dismissed by the family court. P.A. and V.A. both testified that Tanya was dishonest and would make things up to suit her purposes. Tanya testified that she accused V.A. of child abuse based on a sworn statement from a counselor and a psychiatric report.

Rochelle V. is defendant's friend and his child's cousin. She observed defendant and Tanya together when they were dating. She saw them hugging and kissing, laughing and joking around. They argued "like any normal

couple," but seemed happy.  But, Rochelle recalled seeing Tanya with a black eye once.

(Pet., Ex. 1 at 11-20.)

## DISCUSSION

A.   Standard of Review

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, the application must also be unreasonable." *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

B.     Analysis

In the petition, petitioner claims that: (1) there was insufficient evidence that petitioner personally inflicted great bodily injury or personally used a dangerous or deadly weapon when committing the forcible oral copulation alleged in Count 1; (2) counsel provided ineffective assistance by failing to object and failing to move to strike the admission of evidence regarding gang affiliation; and (3) the trial court erred when it instructed the jury that evidence of petitioner's gang affiliation could be considered for a purpose other than the limited purpose for which it was admitted.

1.     Insufficient evidence

Petitioner argues that there was insufficient evidence to support a finding that: (1) petitioner personally inflicted great bodily injury on Tanya, or (2) petitioner personally used a dangerous or deadly weapon. Because the jury found true both of those "triggering circumstances," *see People v. Acosta*, 29 Cal.4th 105, 109 (2002), in relation to Count 1 – the October 30, 2005 incident of forcible oral copulation – petitioner was subject to a 25 year to life sentence under the "One-Strike law," *see* Cal. Penal Code § 667.61.[2] Petitioner argues that, although Tanya testified that petitioner hit her four times while she was performing oral copulation, Tanya did not testify that any injury was inflicted as a result of petitioner's actions. In addition, petitioner argues that there was no evidence to support a finding that he personally used a deadly weapon during the commission of Count 1.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a

---

[2] California Penal Code § 667.61 mandates a court to impose an indeterminate sentence of 25 years to life or 15 years to life upon conviction of certain forcible sex offenses when committed under specific aggravating circumstances. Imposition of a 25 year to life sentence is imposed if a jury finds, *inter alia*, that defendant personally inflicted great bodily injury on the victim during the commission of the offense. *See* Cal. Penal Code § 667.61(d). Imposition of a 15 year to life sentence is imposed if a jury finds, *inter alia*, that the defendant personally used a dangerous or deadly weapon during the commission of the offense. *See* Cal. Penal Code § 667.61(e).

state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992); *see, e.g.*, *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam) ("the only question under *Jackson v. Virginia*, 443 U.S. 307 (1979), is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324.

With regard to the jury's finding that petitioner personally inflicted great bodily injury on Tanya while committing forcible oral copulation, the California Court of Appeal set forth the elements needed to support this enhancement, and rejected petitioner's claim as follows:

> Section 667.61, former subdivision (e)(3) provides for a sentence enhancement when "[t]he defendant personally inflicted great bodily injury on the victim or another person in the commission of the present offense in violation of Section 12022.53, 12022.7, or 12022.8." "Great bodily injury" as used in each of those code sections "means a significant or substantial physical injury." (§ 12022.7, subd. (f); 12022.53, subd. (d); 12022.8; *People v. Escobar* (1992) 3 Cal.4th 740, 749-750 (*Escobar*); *see also People v. Miller* (1977) 18 Cal.3d 873, 883 [construing great bodily injury in former §§ 213 and 461 to mean "significant or substantial bodily injury or damage as distinguished from trivial or insignificant injury or moderate harm"].) It means "a substantial injury beyond that inherent in the offense itself." (*Escobar*, at pp. 746-747.)
>
> Our state Supreme Court "has long held that determining whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury. [Citations.] '"A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description."' [Citations.] Where to draw that line is for the jury to decide." (*People v. Cross* (2008) 45 Cal.4th 58, 64.)
>
> On the way home from Hollister on October 30, 2005, defendant struck Tanya more than 20 times in the head, face, lip, nose, right breast, and stomach with his fists and with the shotgun. After defendant and Tanya returned to his parents' home and she had washed the blood off her face, defendant pushed her up against the refrigerator, choked her with one hand, and covered her injured mouth with his other hand. As they went up the stairs, he hit her in the back of the head with the butt of the shotgun. In the bedroom, he put his hand over her already cut and battered mouth, squeezed hard, and "smothered" her mouth. He grabbed her by the hair and pulled her head down toward his penis. As she was orally copulating him, he punched the right side of her bruised and battered

> head eight more times (he punched her four separate times, inflicting two blows each time). Such a battering is not inherent in the crime of oral copulation.
>
> The majority of Tanya's injuries were to her head and face. The emergency room physician and the nurse testified that Tanya's injuries included multiple contusions to her scalp and face, extensive bruising around her eyes, severe soft tissue swelling, and bruises to her right side and right breast. Both of her eyelids were swollen shut and she was diffusely tender to touch on her neck and scalp. Tanya's vision was blurred and she complained of ear pain and headaches.
>
> It was for the jury to determine which injuries were due to the beating in the car and which were due to the beatings inflicted as part of the oral copulation. In our view, based on these facts, there was substantial evidence that supported the jury's finding that defendant personally inflicted great bodily injury on Tanya while committing forcible oral copulation.

(Pet., Ex. 1 at 22-24.)

Petitioner's argument that Tanya suffered no "great bodily injury" during the commission of Count 1 is based on his belief that no injury was conclusively found to have occurred during the forcible oral copulation. The record shows that although Tanya was assaulted in the car prior to the oral copulation, petitioner had also punched Tanya in the side of her head no less than eight times during oral copulation. Hospital staff reported that Tanya's injuries included "multiple contusions to her scalp and face, extensive bruising around her eyes, older bruising on her left eyelid, and bruises to her right side and right breast. Both of her eyelids were swollen shut and she was diffusely tender to touch on her neck and scalp. Tanya's vision was blurred and she complained of ear pain and headaches. Tanya had severe soft tissue swelling but no intracranial injury or fractures." (Pet., Ex. 1 at 17-18.)

Here, there are inferences that can be made on both sides as to when Tanya suffered "great bodily injury." In such instances, when confronted by a record that supports different inferences, a federal habeas court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. Indeed, "it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam); *see McDaniel v. Brown*, 130 S. Ct. 665, 673-74 (2010) (finding Ninth Circuit erred by failing to consider all of the evidence in

light most favorable to the prosecution when it resolved inconsistencies in testimony in favor of petitioner). The jury clearly inferred that Tanya suffered great bodily injuries during the commission of Count 1, and those inferences are supported by the record. *See, e.g.*, *People v. Cross*, 45 Cal.4th 58, 66 (2008) ("when victims of unlawful sexual conduct experience physical injury and accompanying pain beyond that "ordinarily experienced" by victims of like crimes such additional, "gratuitous injury" will support a finding of great bodily injury.") (citation omitted). The state court's decision finding sufficient evidence to support this enhancement was not contrary to or an unreasonable application of *Jackson*.

With regard to the jury's finding that petitioner personally used a dangerous or deadly weapon while committing forcible oral copulation, the California Court of Appeal set forth the elements needed to support this enhancement, and rejected petitioner's claim as follows:

> **Personal Use of a Dangerous or Deadly Weapon or Firearm (§ 667.61, former subd. (e)(4)).**
>
> The California Supreme Court has held that "[p]roof of firearm use during a felony does not require a showing [that] the defendant ever fired a weapon. 'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." (Webster's New Internat. Dict. (3d ed.1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' [Citation.] 'Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022.5[, subdivision] (a).' [Citations.] [¶] Nor must the firearm 'use' be strictly contemporaneous with the base felony. 'In considering whether a gun use occurred, the jury may consider a "video" of the entire encounter; it is not limited to a "snapshot" of the moments immediately preceding a sex offense. Thus, a jury could reasonably conclude that although [the] defendant's presence with the victims was sporadic, the control and fear created by his initial firearm display continued throughout the encounter.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 806 (*Wilson*).)
>
> In *Jones*, *supra*, 25 Cal.4th 98, the Supreme Court interpreted the phrase "in the commission of" as used in sections 12022.3, subdivision (a), and 667.61, former subdivision (e)(4) and concluded that the phrase "in the commission of" has the same meaning for the purposes of sections 12022.3, subdivision (a), and 667.61,

former subdivision (e)(4), as it does under the felony-murder provisions. (*Jones*, at p. 109.) The court explained that "the 'commission' of a sexual offense specified in . . . section 12022.3, subdivision (a), does not end with the completion of the sex act, but continues as long as the assailant maintains control over the victim. [¶] Moreover, as [the court] explained in *People v. Masbruch* [(1996)] 13 Cal.4th 1001 at page 1006, the legislative intent to deter the use of firearms in the commission of specified felonies requires that 'use' be broadly construed. In the case of a weapons-use enhancement, such use may be deemed to occur 'in the commission of' the offense if it occurred before, during, or after the technical completion of the felonious sex act. The operative question is whether the sex offense posed a greater threat of harm – i.e., was more culpable – because the defendant used a deadly weapon to threaten or maintain control over his victim." (*Jones*, at pp. 109-110.)

Defendant concedes that he used the gun to batter Tanya in the car between Hollister and San Jose. But, he contends that once he was at his parents' house and put the gun under the mattress, where he customarily kept it, he was no longer using the gun within the meaning of section 667.61, former subdivision (e)(4). He relies, in particular, on the following testimony by Tanya:

"Q. [by the prosecutor]: The fact the he had the shotgun there in the room, was that one of the reasons that you agreed to perform oral sex on him that night?

"A.: I was so beaten. I just didn't want to get beat anymore.

"Q.: Did it make you afraid to know that he had that shotgun in the room with him?

"A.: Just his hands was enough for me to be afraid. It didn't matter about the gun anymore. I was so beaten."

Defendant argues that this testimony "made it clear that the presence of the gun played no part in [Tanya's] compliance with [his] demand for oral sex." He asserts that she feared being beaten by defendant, not that he would use the gun; that once he put the gun away, there was no threat to use it; that Tanya did not succumb to his demands for oral sex because of the gun; and that consequently the evidence was insufficient to support the gun enhancement. We are not persuaded.

Tanya testified that once defendant acquired the shotgun, he kept it with him at all times and took it everywhere. She had seen him brandish it at his father and shoot it into the air. Thus, she knew defendant knew how to use the gun.

In light of the requirement that gun use be interpreted broadly and of the "video" of the encounter between defendant and Tanya on October 30, 2005, we conclude that there was sufficient evidence to support the jury's true finding on the gun use enhancement. Here there was more than a "bare potential" that the shotgun would be used. (*Wilson*, *supra*, 44 Cal.4th at p. 806.) Defendant made the gun's presence known and used the gun to beat Tanya on October 30, 2005. In the car ride from Hollister to San Jose, he struck her on the side, on her breast, and elsewhere with the barrel of the gun. As they went up the stairs in his parents' house, he struck her on the back of the head with the butt of the gun, shortly before demanding oral sex from her. He then stashed the gun under the mattress of the bed where the sex offense occurred. Tanya testified that while she orally copulated defendant, she knew that the gun was within his

> reach, if he wanted to reach for it. This evidence supports a finding of a facilitative use of the shotgun, i.e., that defendant deliberately used the shotgun and made its presence known to maintain control over Tanya. (*Jones*, *supra*, 25 Cal.4th at pp. 109-110.) With regard to Tanya's testimony that "[i]t didn't matter about the gun anymore," the jury was free to disregard that testimony or give it whatever weight it decided it deserved in light of the totality of the evidence and the "video" of the entire encounter between defendant and Tanya.
>
> Defendant attempts to distinguish this case from four cases in which appellate courts have found sufficient evidence to support imposition of gun use enhancements by discussing the facts in *People v. Granado* (1996) 49 Cal. App. 4th 317, 325; *People v. Masbruch* (1996) 13 Cal.4th 1001, 1004-1005; *People v. Carrasco* (2006) 137 Cal. App. 4th 1050, 1054-1055; and *Wilson*, *supra*, 44 Cal.4th at page 807. We have reviewed defendant's argument and are not persuaded that defendant's use of the shotgun here is distinguishable from the gun use in any of those cases.
>
> For all these reasons, we conclude there was substantial evidence to support the jury's finding that defendant used a firearm to commit forcible oral copulation within the meaning of section 667.61, former subdivision (e)(4).

(Pet., Ex. 1 at 24-27.)

Petitioner argues that Tanya's testimony demonstrates that she conceded being unafraid of petitioner's shotgun and that she was afraid of petitioner's hands rather than the shotgun. As such, continues petitioner, there was insufficient evidence to find the enhancement true. However, based on a review of the record, the *Jackson* standard, and California's broad definition of the term "use", the court finds that the California Court of Appeal's conclusion was not contrary to or an unreasonable application of *Jackson*.

    2.    <u>Ineffective assistance of counsel</u>

Petitioner claims that counsel rendered ineffective assistance of counsel by: (1) failing to object to the admission of evidence regarding petitioner's gang affiliation being more prejudicial than probative, and (2) failing to move to strike such evidence because it was not relevant to prove the element of fear with regard to the count of criminal threats (Count 2) after Tanya testified.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was

prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In other words, the appropriate question regarding prejudice is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 694).

At the preliminary hearing, Tanya had testified that petitioner's gang affiliation was one of the reasons that she was afraid of petitioner. The court ruled that petitioner's gang affiliation was irrelevant to the charges and for the purpose of impeachment, but that it was relevant to Tanya's state of mind and would come in with a limiting instruction. Then during trial, the prosecution requested that petitioner remove his shirt in order for the jury to see petitioner's tattoos because they were relevant as to the charge of criminal threats and Tanya's fear or belief that petitioner could harm her or carry out his threats. Over objection, the trial court ruled that Tanya could testify regarding her state of mind but could not give her opinion on whether petitioner was in a gang.

During trial, Tanya testified that she did not want to talk about petitioner's gang involvement, and that she could not answer questions about petitioner's gang affiliation and feel safe. Tanya testified that petitioner's tattoos caused her to be afraid of being hurt by petitioner and his friends. Tanya testified that she believed testifying about gangs could lead her or her family to get hurt, and that she was concerned about the affiliation represented by petitioner's tattoos. "The prosecutor then asked, "Based on his tattoos and yelling Norte and some people you felt he might be affiliated with, did that make you feel more afraid of the defendant?" Tanya responded, "It had me concerned for his ability to find me and hurt me if I ever left. His affiliation didn't hurt me, he did." (Pet. Ex. 1 at 28-29; 5 RT 204.)

The California Court of Appeal rejected petitioner's ineffective assistance of counsel claims. The state appellate court stated that, in California, evidence of gang membership should not be admitted if its probative value is small in cases such as petitioner's that do not involve the gang enhancement. (Pet., Ex. 1 at 30.) The appellate court relied on California case law, and

reasoned that one of the elements of criminal threats was that the threat actually caused Tanya to be in sustained fear for her own safety or for her family's safety. *See* Cal. Penal Code § 422. To be found guilty of forcible oral copulation, the prosecution had to prove that petitioner accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury. *See* Cal. Penal Code § 288a(c)(2). The state appellate court stated that Tanya had testified that one of the reasons she was afraid of petitioner was because she believed he was involved in a gang based on his tattoos. Based on that, concluded the state appellate court, evidence of petitioner's gang affiliation was highly probative and relevant to the element of fear in three of the charged offenses. In addition, the state appellate court noted that counsel was successful in limiting the gang evidence so that no gang expert testified, nor was there any evidence regarding the gang's territory or criminal enterprises. Finally, the California Court of Appeal rejected petitioner's assertion that counsel was deficient for failing to strike the evidence of gang affiliation on the grounds that it was irrelevant after Tanya stated that petitioner's affiliation did not hurt her. The state court noted that that statement was one in a myriad of other evidence in which Tanya stated that the tattoos were one of the reasons she was afraid of petitioner; that she was concerned about the affiliation represented by the tattoos; that she was afraid to talk about certain aspects of petitioner's life; that she did not want to talk about petitioner's gang involvement; and other similar statements.

In addition, the California Court of Appeal concluded that even if counsel was deficient for failing to object or for failing to strike, the deficiencies were not prejudicial. (Pet., Ex. 1 at 33-34.) The state court properly applied *Strickland*. Even assuming that counsel was deficient in failing to object or failing to move to strike the gang evidence, petitioner has failed to demonstrate prejudice. *See Strickland*, 466 U.S. at 697 (recognizing that the court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies). Here, as the state appellate court concluded, this was not a close case in which admission of gang evidence prejudiced the defense or had an effect on the outcome.

Petitioner was convicted of two counts of forcible oral copulation; making criminal

threats; assault with a firearm; infliction of corporal injury on a cohabitant with a prior conviction; and aggravated assault. The evidence was overwhelming that petitioner beat Tanya on a daily basis, punched her, assaulted her with weapons (a screwdriver and a shotgun), threatened her, threatened her family, and forced Tanya to orally copulate him against her will. While the admission of gang evidence did not paint petitioner in a better light, the strength of the evidence against petitioner was so strong that even if the gang evidence were excluded, there is no reasonable probability that the result of the proceedings would have been different.

The state court's decision was not contrary to or an unreasonable application of *Strickland*, and petitioner is not entitled to federal habeas relief.

        3.      <u>Jury instruction</u>

Petitioner argues that the trial court erred by instructing the jury that evidence of gang activity could be considered for a purpose for which it was not admitted, and to which it was not relevant. Petitioner explains that the trial court allowed the prosecution to admit evidence that Tanya was fearful of petitioner's gang affiliation specifically because it was relevant to the criminal threats charge "and Tanya's reasonable fear or her belief that [petitioner] could cause her harm or carry out his threats." 5 RT 195. In contrast, states petitioner, the trial court instructed the jury that the gang affiliation evidence could only be used to determine whether the forcible oral copulations charges had been accomplished by force or fear, and did not allow the jury to consider the evidence with regard to criminal threats. Because of the trial court's conflicting actions and limiting jury instruction, the jury was prohibited from considering the gang affiliation evidence as to Tanya's fear with regard to the criminal threats charge. Thus, argued petitioner, the jury was left with no choice but to consider the gang affiliation charge as propensity evidence instead.

The trial court instructed the jury with CALCRIM No. 1403, and stated, "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant accomplished an act or acts of oral copulation by force, violence, duress, menace or fear. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to

commit crime." (Pet., Ex. 1 at 40.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The defined category of infractions that violate fundamental fairness is very narrow: "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Id.* at 73. A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.* (citation omitted).

The California Court of Appeal rejected petitioner's claim as follows:

> Defendant asserts that the trial court erred in instructing the jury that it could consider the evidence of his gang affiliation for "the limited purpose of deciding whether [he] accomplished an act or acts of oral copulation by force, violence, duress, menace or fear." He argues (1) that the trial court admitted the gang evidence on the criminal threats count only; (2) that the prosecutor relied on the gang evidence in his argument regarding the criminal threats count; (3) that the gang evidence was irrelevant to the oral copulation counts because Tanya testified that defendant's gang "affiliation didn't hurt [her], he did"; and (4) that the limiting language in the jury instruction prohibited the jury from using the gang evidence on the criminal threats count. From these facts, defendant reasons that the jury had only one option, which was to use the gang evidence to prove that defendant was a bad person with a propensity to commit crimes. Defendant contends that the instruction deprived him of his federal and state due process right to a fair trial because it compelled the jury to use inadmissible, irrelevant character evidence to show propensity.
>
> Although the prosecution initially argued that the gang evidence was relevant to the criminal threats count, the court stated that it was relevant to Tanya's state of mind and the element of fear in general terms and did not limit its admission to any particular count. The trial court also stated that its in limine ruling on the admissibility of the gang evidence could change if circumstances changed. As we observed before, Tanya's state of mind was relevant to the element of fear in both the criminal threats and the oral copulation counts and this likely became clearer to the court as the trial unfolded. Tanya testified that the criminal threats and the first incident of forcible oral copulation occurred on separate occasions in mid-October 2005. The second incident of forced oral copulation occurred approximately two weeks later, on October 30, 2005. It would be reasonable to infer from the sequence of events that if Tanya feared defendant in mid-October, due in part to her belief that he was a gang member, that she

> harbored that same fear at the end of October.
>
> The parties and the court had an unreported jury instructions conference. Later, both sides stated that they were satisfied with the jury instructions. It is reasonable to infer that the parties agreed to include the oral copulation counts in the CALCRIM No. 1403 instruction at the jury instruction conference, since the law and the evidence indicated that Tanya's fearfulness was relevant to those counts. The record does not disclose why the parties did not include the criminal threats charge in the CALCRIM No. 1403 instruction, but that omission cannot be said to have prejudiced defendant.
>
> Defendant attaches too much importance to Tanya's testimony that defendant's "affiliation didn't hurt [her], he did." As noted before, even though she made that statement, she also testified that she feared defendant in part because she thought he was in a gang. In addition, the prosecutor did not limit his argument that Tanya feared defendant because of his gang affiliation to the criminal threats count. He also related her fear based on defendant's gang affiliation to the oral copulation charged in count 3 and (as defendant asserts in another part of his brief) arguably all of the counts.
>
> The court also expressly instructed the jury that it was not to consider the gang evidence for any purpose other than determining whether defendant accomplished the oral copulations by force, violence, duress, menace or fear and that it was not to "conclude from this evidence that . . . defendant is a person of bad character or that he has a disposition to commit crime." Thus, the wording of the instruction belies defendant's assertion that the instruction compelled the jury to find that he was a bad person with a propensity to commit crimes. The court also instructed the jury that some of the "instructions may not apply, depending on [its] findings about the facts of the case." Thus, if the jury had found that the CALCRIM No. 1403 instruction did not apply to the facts, it was not compelled to conclude that defendant was a person of bad character with a disposition to commit crime as defendant now asserts.

(Pet., Ex. 1 at 41-43.)

Petitioner's argument that the limiting instruction compelled the jury to use inadmissible and irrelevant character evidence is unpersuasive. A review of the record demonstrates that when read in context, the trial court did not limit the admission of gang affiliation evidence to the criminal threats count. The prosecutor indeed suggested that petitioner's gang affiliation was relevant to the criminal threats charge and Tanya's fear of petitioner. 5 RT 194-95. In the discussion that followed, the court determined that evidence of petitioner's gang affiliation was relevant to Tanya's state of mind and it could be introduced for that purpose, but that Tanya was not permitted to testify as to whether petitioner was in fact a gang member. 5 RT 195-96. Moreover, juries are presumed to follow the instructions given to them, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and the record is devoid of any indication that they did not do so here.

Nonetheless, even assuming that the jury instruction was erroneous and violated petitioner's due process, petitioner cannot demonstrate that it had a substantial or injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 637. Based on the record, and the strength of the evidence demonstrating the reasons that Tanya would be fearful of petitioner, there is not a reasonable likelihood that the evidence of petitioner's gang affiliation had a substantial or injurious effect on the jury's verdicts.

Accordingly, petitioner has failed to demonstrate that the state court's rejection of these claims was contrary to, or an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2244(d).

## CONCLUSION

Petitioner's petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 8/14/14

_____
LUCY H. KOH
United States District Judge